THE MISSOURI PACIFIC RAILWAY COMPANY v. F. M. McCALLY, *as Administrator of the estate of Dexter F. McCally, deceased.*

1. PERSONAL INJURIES—*Action*—*Contributory Negligence, Matter of Defense.* In an action against a railroad company to recover damages for personal injuries to a brakeman, occasioned by the negligence of a coëmployé, it is unnecessary for the plaintiff to aver that there was no fault or negligence on the part of the injured person. Contributory negligence is a matter of defense. (*K. C. L. & S. Rld. Co. v. Phillibert,* 25 Kas. 582, cited, and followed.)

2. FACTS STATED—*Questions for Jury, When for Court.* In such an action, when a brakeman was engaged in the duties of switching and coupling cars ahead of an ordinary freight engine, that was being used for switching purposes, in one of the yards of the company, a switch engine never having been prepared for use in that yard; and having made a coupling ahead of the engine to a box car, (another brakeman being placed on the box car,) and as the engine moved forward to some loaded coal cars ahead, took a position on the platform to which the pilot is attached, immediately in front of the boiler head and behind the pilot beam, and the engine was driven with such speed against the loaded coal cars as to inflict injuries that caused his death, the questions as to whether that position was one of danger, and voluntarily chosen by the deceased, and whether it was the usual custom of all brakemen in that yard, and in all other yards on that road, to ride on the pilot, are questions of fact to be determined by the jury under all the circumstances. It is only when it clearly appears and the facts are undisputed, that the injured employé has voluntarily chosen a dangerous position, a safer one having been provided by the company, that the court can say as a matter of law that the selection was such contributory negligence as would defeat a recovery.

3. PETITION—*Amendment*—*Judgment, Not Reversed.* After trial, the plaintiff asked, and was permitted by the court, to amend his petition so as to make it conform to the facts proved. This order of amendment is equivalent to a finding of fact by the court; and the judgment will not be reversed by this court, because it is apparently against the weight of the evidence produced at the trial; there is some evidence to sustain it, and it cannot be disturbed on error.

*Error from Franklin District Court.*

ACTION under § 422 of the civil code, to recover damages for wrongfully causing the death of Dexter F. McCally.

Trial at the October term, 1886, and judgment for the plaintiff for $3,000. The defendant *Railway Company* brings the case to this court. The material facts are stated in the opinion.

*W. A. Johnson,* for plaintiff in error.

*H. P. Welsh,* and *Jno. W. Deford,* for defendant in error.

Opinion by SIMPSON, C.: This was an action commenced by F. M. McCally, administrator of the estate of Dexter F. McCally, deceased, against the Missouri Pacific Railway Company, in the district court of Franklin county, to recover damages for wrongfully causing the death of the said Dexter F. McCally, deceased, under § 422, chapter 80, Compiled Laws 1885. The petition of the plaintiff in error alleged in substance, that prior to the 12th day of December, 1885, D. F. McCally was a brakeman in the employment of the defendant, and as such his duty was to assist in running its trains on its line of railway between the towns of Holden, in Missouri, and Leroy, in Kansas; that at, and for a long time prior to, that date, one Henry Snyder, being an employé of the defendant, and being an ostler at its station in Leroy, having the charge and management of its locomotive engines while at that station, and it being his duty in part to act as engineer of its engines when they were being used at that station in switching and shifting cars to and from its side and main tracks and switches, was incompetent to perform that duty, as the defendant well knew, or by the use of ordinary diligence could have known; that on said 12th day of December, 1885, said Henry Snyder was in charge of one of defendant's locomotive engines at its station at Leroy, and was engaged in switching cars, in which duty he was assisted by the said Dexter F. McCally and one J. P. Calloway, who was then in the employment of the defendant as brakeman ; that the locomotive had been attached to a box car on a side-track by said Dexter F. McCally by a coupling; that immediately upon the coupling of said box car and engine the said Snyder started the engine, pushing said

box car ahead of it and along said side-track toward three freight cars loaded with coal, then standing on said side-track; that Snyder drove said engine and box car toward said coal cars with a speed much greater than was proper, prudent, or safe, or customary in such cases, or under such circumstances; that after coupling said engine and box car together the said Dexter F. McCally remained standing on the steps of the pilot of said engine, the usual place at which brakemen stand when engaged in switching cars on side-tracks in this manner and for such purposes, until the collision hereinafter mentioned; that said Snyder drove said engine and box car with such speed that it collided with said coal cars, and crushed the said Dexter F. McCally between them, and injured him so that he died within a few hours; that during the passage of said engine and box car along said side-track to the point at which they collided with the loaded coal cars, the said Dexter F. McCally remained standing at his post on the steps of the pilot, and that his death was caused by the incompetency of the said Henry Snyder, and by his carelessness, negligence and mismanagement in driving said engine and disobeying the signals, and permitting said engine and box car to collide at such an excessive, improper and dangerous speed with said loaded coal cars; that during this time the other brakeman, J. P. Calloway, who was an experienced man, was at his post on the roof of said box car, prepared to apply brakes and give signals to the said Snyder, and observing that the speed of said engine was too great, and that unless checked they would crush into said coal cars with such force and violence as to wreck the whole train, he gave to said Snyder the proper signals to reduce the speed of the engine; that said Snyder paid no attention to the signals, and then Calloway shouted to him repeatedly in a loud voice to check the headway of the engine, or "slow down" the motion of the same, but said Snyder, either not seeing or not hearing, or disregarding and disobeying said signals and shouts, paid no attention thereto, and said Calloway became greatly alarmed, screaming with all his might to Snyder, begging, ordering, and urging him to check

41 — 41 KAS.

the speed of the engine and box car; that Snyder paid no attention, and Calloway applied the brakes on the box car with all his force and then took his station on the middle of the roof of said box car, so as to avoid as much as possible the approaching danger; that soon thereafter occurred the collision, driving the pilot of said engine backwards under the same, breaking the massive draw-bar, derailing the forward trucks of said engine, hurling Calloway to the ground from the roof of said box car, and crushing the said Dexter F. McCally between the box car and engine; that Snyder was guilty of negligence, carelessness and mismanagement by disregarding the signals, shouts and screams of Calloway, and that such negligence, etc., caused the death of Dexter F. McCally.

Two motions were directed against this petition by the plaintiff in error. One of them was to make the petition more definite and certain, by showing in what manner the plaintiff had been damaged by the death of the intestate; and this was sustained. The other was to strike out all that part of the petition that stated the action of Calloway, and the result of the collision on Calloway, as redundant and irrelevant matter; and this was overruled, and the order overruling it is one of the assignments of error. The petition being amended in response to the first motion, the plaintiff in error then demurred to it, on the ground that it did not state facts sufficient to constitute a cause of action against the railway company. The demurrer was overruled, and this is another assignment of error. The plaintiff below then amended his petition in certain respects, and the defendant answered, denying the allegations of the petition generally; and second, alleging that the death of McCally was the result of his own negligence and carelessness; and third, that said McCally died intestate, in the state of Missouri, and left no estate to be administered upon in Franklin county, Kansas; that the probate court of Franklin county, Kansas, had no power to appoint an administrator, or jurisdiction to grant letters of administration on said estate; that all its acts respecting it are void, and that

the plaintiff has no right to sue as administrator. To this answer a reply was filed, making an issue. The case was tried by a jury at the October term, 1886, and a verdict of three thousand dollars was returned in favor of the plaintiff below. The following special interrogatories were submitted to the jury, and answered by them, to wit:

"1. Do you find that Henry Snyder was a competent and fit engineer to manage the engine, at the time Dexter F. McCally was injured? A. Yes.

"2. Do you find at the time Dexter F. McCally was injured he was riding on the pilot of the engine? A. No.

"3. Was there any place prepared on the pilot of the engine for brakemen to ride, when braking or coupling cars in the yard? A. No.

"4. Do you find that Henry Snyder, the engineer, was negligent in the management of his engine at the time Dexter F. McCally was injured? A. Yes.

"5. Do you find that Henry Snyder, the engineer, mismanaged his engine at the time Dexter F. McCally was injured? A. Yes.

"6. If you find that Henry Snyder, the engineer, was negligent in the management of his engine at the time Dexter F. McCally was injured, in what did such negligence consist? (Objected to by plaintiff, and not answered.)

"7. If you find that Henry Snyder, the engineer, mismanaged his engine at the time Dexter F. McCally was injured, in what did such mismanagement consist? (Objected to by plaintiff, and not answered.)

"8. Was the engine on which Dexter F. McCally was riding, in forward movement, or was it moving backward at the time it collided with the coal cars? A. Forward.

"9. Do you find that Henry Snyder reversed his engine when it was one hundred feet distant from the coal cars? A. Yes.

"10. Do you find that Dexter F. McCally coupled the engine to the box car, and then voluntarily got upon the pilot in front of the engine to ride to the place where it was to be coupled to the loaded coal cars on the track? A. To the first question, yes. To the second question, no.

"11. Did Henry Snyder, the engineer, know that Dexter F. McCally was riding on the pilot at the time he was run-

ning the engine over the track from where it was coupled to the box car to the loaded coal cars?    A. We don't know.

"12. Do you find that there was room in the cab of the engine with the fireman and engineer, for Dexter F. McCally to ride from where he coupled the engine and box car together to where the coal cars were on the track?    A. Yes.

"13. Did any employé of the defendant company order or direct Dexter F. McCally to get on the pilot in front of the engine, to ride from where the engine and box car were coupled together?    A. No.

"14. Did any employé of the defendant company know that Dexter F. McCally was going to attempt to ride on the pilot, until after he had gone on the pilot and the engine was passing along the track toward the coal cars?    A. No.

"15. Do you find that at the time Dexter F. McCally was injured that there was a violent snow-storm in progress? A. It was snowing, but not violent.

"16. Do you find that at the time Dexter F. McCally went upon the pilot to ride, the ground was covered with snow, and a snow-storm was then in progress, and had been for several hours, and the rails were wet and slick?    A. The ground was covered with snow; had been snowing for several hours; and the rails were not wet.

"17. Do you find that Dexter F. McCally was a careful and prudent man?    A. Yes.

"18. Was Dexter F. McCally guilty of any negligence proximately contributing to his death?    A. No.

[No number 19.]

"20. What was the distance from where the engine and box car were coupled together, to where the coal cars were on the track?    A. About eighteen hundred feet.

"21. Do you find that it was necessary, in order to get the coal cars in the yard, to couple the box car in front of the engine, and push it ahead of the engine to the coal cars, and then couple the coal cars to the box car?    A. No.

"22. Do you find that in shifting the cars on the track in the yard at Leroy station the morning that Dexter F. McCally was injured, Henry Snyder, the engineer, was under the direction of Dexter F. McCally and James P. Calloway, and that Dexter F. McCally signaled the engineer on to the track where the engine was coupled to the box car?    A. Yes.

"23. Do you find that after Dexter F. McCally signaled the engineer to come on the track where the box car stood,

that he then coupled the engine to the box car and voluntarily got on the pilot to ride over the track to where the coal cars stood? A. To the first question, yes. To the second question, no.

"24. Do you find that at the time Dexter F. McCally coupled the engine and box car together, and got on the pilot to ride, that he knew the loaded cars stood on the same track, and that the engine would drive the box car ahead of it to the coal cars, for the purpose of coupling to them and drawing them out onto some other track of the yard? A. Yes, but he had to get onto the pilot to, make the coupling.

"25. Could Henry Snyder, the engineer, as he drove his engine toward the coal cars with the box car in front of him, see the coal cars on the track? A. Yes.

"26. Do you find that at the time Dexter F. McCally went upon the pilot to ride, he was acquainted with the condition of the yard at Leroy station? A. No evidence that he went upon the pilot to ride, nor that he was acquainted with the condition of the yard at Leroy station.

"27. Do you find at the time Dexter F. McCally was injured the wind was blowing from the west, and it drove the smoke and steam ahead, so as to prevent the engineer from seeing objects ahead of the engine? A. No.

"28. Would Dexter F. McCally have been injured if he had got in the cab, or on the tender, to ride over the track from where he coupled the engine and box car together, to the coal cars? A. We don't know."

Giving the facts attending the injury to McCally more in detail than stated in the answers to the special interrogatories by the jury, we gather from all the evidence in the record, that the engine in use that day was not a switch engine prepared especially for use in the yard, with foot-boards and hand-rails in front of the engine and in the rear of the tender, for the employés to ride on while engaged in the duties of switching, but was an ordinary freight engine that was being used daily to draw freight trains. There was no switch engine in use at the Leroy yards, the switching all being done by the freight engines. The engineer Snyder and the fireman both testify that they did not see any signals given by the brakeman Calloway, who was on the top of the box car, after he gave the one to start. The engineer estimates the distance

between his position in the cab and the top of the box car at twenty-five feet, and says he reversed the engine and let it have sand at a point distant from the place where they struck the coal cars, of from one hundred and fifty to one hundred and seventy-five feet, and that he did this on a signal from the fireman, who stated that he thought that he saw cars on the track ahead. Calloway testifies that he gave repeated signals to "slow down," and when no attention was paid to them, he called to them, and not getting any response, applied the brakes on the box car with all his force, and prepared himself for the shock of the collision. The evidence is conflicting as to whether or not the position taken by McCally in front of the engine was ordinarily safe in discharging his duty, under the circumstances; and it varies, too, as to what the custom was in this particular respect in the Leroy yards. In the course of the trial it became evident that the allegations of the petition in respect to the position of McCally had misdescribed it; that in fact he was not standing on the steps of the pilot, but was sitting on the pilot beam, immediately in front of the boiler head, with his feet drawn up under his body. The trial court allowed the petition to be amended so as to conform to the proof, and this is assigned for error. This probably embraces all the controlling facts, when taken in connection with the special findings.

I. The first complaint is the refusal of the trial court to strike out as redundant and irrelevant all the allegations of the petition reciting the action of Calloway, and the result of the collision on him. While these matters were not absolutely necessary allegations, and were more a matter of evidence than pleadings, perhaps, yet as all these things appear in the evidence contained in the record of the case, we may put it in the strongest possible light for the plaintiff in error, and waive all defects as to the certainty of the motion, and then it does not appear to be such a material error that the judgment ought to be reversed because of it. A general rule founded in the nature of things and based on evident principles is, that a motion to make a petition more definite and certain, by striking

out redundant and irrelevant matter, should specifically point out the very words or sentences sought to be expunged from the record, and not allude to them in general terms, because if the motion does not do so, it is as objectionable as the pleading against which it is directed.

II. The next complaint is that the trial court overruled the demurrer of the plaintiff in error to the petition. This demurrer was based upon the ground that the petition does not show that at the time of the injury complained of the deceased was exercising due care and caution. It is said that it should contain an averment that the deceased was himself free from guilt or negligence which contributed to the injury. A great many authorities are cited to sustain such a cause of demurrer, and in many states the rule is as contended for by the counsel for the plaintiff in error; but the question in this state is not an open one, as it was expressly decided in the case of *K. C. L. & S. Rld. Co. v. Phillibert*, 25 Kas. 582, that contributory negligence is a matter of defense. The demurrer on this ground was properly overruled.

1. Personal injuries — action — contributory negligence, matter of defense.

III. We come now to the controlling question in this case. The railroad company seeks to avoid liability on the theory and for the reason that the deceased voluntarily assumed a position of great danger, and thereby directly contributed to the injury that resulted in his death. It may be admitted that McCally voluntarily assumed his position upon the pilot of the engine; and yet this voluntary choice of position must be viewed in the light of the surrounding circumstances, and especially must it be considered with reference to these accompanying facts:

*First,* No switch engine with foot-boards and hand-rails had been provided by the company for use in the yards at Leroy.

*Second,* The switching was being done with an ordinary freight engine.

*Third,* Had a switch engine been in use on that occasion,

the proper place for McCally to assume would have been on the foot-board in front of the engine.

*Fourth,* It is conclusively established that a switchman would necessarily have to get on the pilot of the engine to make the coupling to the box car.

*Fifth,* McCally had duties to perform in switching and coupling that compelled him to ride on the engine, and he had an absolute right to be somewhere on the engine. He had no duties to perform that entitled him to be in the cab.

*Sixth,* He assumed a position on the freight engine as nearly corresponding to what would have been his proper position on a switch engine, as the structure of the freight engine would permit.

The assumption that the position was a dangerous one, and that it was deliberately chosen by the deceased, is the most favorable view that can be taken in favor of the plaintiff in error; but when such assumption is modified by all these accompanying facts and circumstances produced by the action of the railroad company, and in no manner controlled by the deceased, or in any way affected by his action, it seems clear that the decision of the case ought not to be controlled by the principle contended for. If the record had presented a state of facts that justified the court in saying that the railroad company had performed all that reasonably could be required of it, in furnishing the employés the usual machinery and appliances for the discharge of the ordinary duties of the employment, and that these were in good condition and reasonably safe, then under such circumstances the voluntary choice of a more dangerous position than the one ordinarily taken by the employé would relieve the company from all liability for injury occurring. But there is a conflict in the evidence as to whether this position on the beam of the pilot of the engine is a dangerous position or not, and hence the assumption upon which we have been proceeding heretofore is not necessarily to be taken in order to sustain this judgment.

There is some evidence in the record from experienced railroad men, that the position is not more dangerous than that

of any other place on the engine. Of course the safety of any place on the engine depends on a variety of circumstances: such as the direction it is moving; the point of a collision; the rate of speed at the time an accident occurs; and many other things. If the engineer had backed into the coal cars at an unusual rate of speed, the most dangerous place would have been on the rear of the tender; and if McCally had assumed such a position, the case would have been much stronger for the company than the one now presented. The question, then, as to whether or not the position taken by McCally on the pilot beam was, under all the circumstances, dangerous, involved an issue of fact that was submitted to the jury, and necessarily passed upon by them in making their general verdict adversely to the railroad company.

There was another serious conflict in the evidence as to the usual custom of brakemen in that yard and on that road, riding on the pilot of the freight engines that were engaged in switching. An experienced brakeman who worked for the company testified that in the yard at Leroy, and in fact on all that road, it was the usual place for the man who made the coupling to take position on the pilot of the engine; and that in his judgment it was the proper place for a man to take who was making couplings ahead of the engine. A conductor examined as a witness for the company said that he had seen brakemen riding on the pilot when switching cars at Holden, on the Missouri Pacific Railroad, and that he had seen them sitting on the beam with their feet drawn up under them. Snyder, the engineer, testified that he had occasionally seen the brakemen riding on the pilot. It would naturally follow from such proof that the jury would conclude that McCally had assumed the usual position that custom in that yard had sanctioned, when he placed himself on the beam of the engine; that this custom was known to the company; that it was a necessity arising from the structure of the engines used in switching, and that the company had suffered and allowed it to be done; that the deceased had only done what his observation and experience had shown to have been done by other

employés engaged in the same line of duty. Then we have these two concurring facts found by the jury, and fairly embraced in their general verdict: first, that the position was not a dangerous one; and second, that it was the usual place taken by brakemen in that yard, when discharging the duties of switchmen. These facts distinguish this case from the cases of *Railroad Company v. Jones*, 95 U. S. 439; *Hough v. Rly. Co.*, 100 id. 213; and *Kresanowski v. N. P. Rly. Co.*, 18 Fed. Rep. 230, which are so confidently relied on by counsel for the plaintiff in error to control the decision here. In these cases the injured employés were not engaged in performing the duties of throwing switches or coupling cars: they were engaged in other work, and voluntarily took positions upon the pilot, or cow-catcher. There was absolutely nothing to be done by them in the management or operation of the train, and certainly nothing that required them to be about or ride on the pilot. In the Jones case, the employé was both expressly warned against riding on the pilot, and directly forbidden to do it. The railroad company had provided a box car for him to ride in, and there was room for him in that car. In the Hough case, a verdict for the company was reversed, and a new trial ordered, for misdirection to the jury. In the other case, the injured employé was being conveyed to and from his work of excavating, on an engine, and he with others rode on the pilot, and was injured in a collision. Under these circumstances the jury were instructed to bring in a verdict for the railroad company, for the reason that the injured man had voluntarily placed himself in a dangerous position.

Neither does this case fall within the rule announced by this court in the case of *U. P. Rly. Co. v. Estes*, 37 Kas. 715, for in that case the injury occurred on a regular switch engine, provided with front and rear foot-boards and hand-rails, and the injured employé voluntarily selected a cab-step to ride on. In this case, no special provision is made for the employé to ride; no special place is provided for him; he is expected to ride, of course, and in doing so must be governed by the de-

mands of duty; if he is to couple or switch ahead, he must ride near the head of the engine, so as not to delay the work; or if he is to switch or couple behind the engine, his position would naturally be on the rear part of the engine. He must act promptly, decide quickly, and not delay the work. All these things distinguish this case from any of the reported ones.

There is another principle applicable in this case, that does not reach the facts of the reported cases, and that is this: It was the duty of the railroad company to provide a switch engine for use in its yards at Leroy, because that is the ordinary and usual appliance for performance of such work; and because it is ordinarily safe for the employés of the road engaged in such service; and they are entitled to this reasonable degree of protection. The railroad company failed to do this, but required such work to be performed by the ordinary freight engine between trips, and by this failure, as well as by the instrumentalities employed, it subjected its employés to perils and hazards against which it could have guarded, by the exercise of ordinary care and caution in supplying the yard with an engine properly constructed for such service. It cannot be disputed but that it is more dangerous to switch with a freight engine than with one prepared especially for that purpose. It is a universal rule that the employé risks the dangers which ordinarily attend, or are incident to, the branch of the business that he voluntarily engages in for compensation; but it is equally implied, and public policy requires it, that the railroad company shall supply the usual reasonably safe appliances and machinery for such work. Applying these rules to the facts in this case, and while it may be said without qualification that McCally assumed all the risks and perils attending the use of a switch engine in the yards, because as a brakeman he knew he would have such duties to perform, it is not so clear that the use of ordinary freight engines with which to do the switching and other yard duties, was within the contract of employment. In other words, McCally had a right to assume that a switch engine would be

used in the yards, but if a freight engine was used he would perform the same duties, assume the same positions, and rely on the careful management of the person in charge of the engine, and have the same remedies if he was injured, as if a switch engine had been used. If the theory of the counsel for plaintiff in error is to prevail, and control the decision of this case, it would practically make no difference what might have been the position of McCally on the engine. No recovery could be had for the injury, for if he placed himself on the engine, any position that he could possibly take would be one of danger, as in a collision of this character it was dangerous to be anywhere on the engine; so that the result of the case would be that while the railroad company furnished a freight engine for switching duties, and required its employés to use it, and while in use the engineer by his carelessness and mismanagement causes injury to a brakeman, he cannot recover *because it is a freight engine.*

This record discloses that the immediate cause of the death of McCally was the reckless conduct and gross mismangement of the engineer in charge of the freight engine that was being used in doing the switching. He drove the box car against the loaded coal cars that stood upon the side-track, at such an unusual rate of speed that the most ordinary mind could understand that great injury would inevitably follow. He disregarded, and probably disobeyed, the signals of the brakeman upon the top of the box car. The excuse he gives exasperates the offense. His claim is that there was a blinding snow-storm, and the direction of the wind was such as to blow the smoke of the locomotive into the cab, so that he could not even see the brakeman on the top of the car only twenty-five feet distant. If these facts existed, they were calculated to make any ordinary man in his sober senses more careful and prudent. He does not seem to have been warned by the customary instinct of self-preservation. After the fatal result of the collision, he now says that he gave the engine steam and opened the sand lever and reversed the engine at least one hundred and fifty feet away from the coal cars. He did

this because the fireman gave him a signal to stop, and said "that we were going to strike some coal cars." How the fireman could see beyond the box car and notice coal cars on the track, and yet not see the brakeman on the box car, or hear his shouts, is not explained. Every other material fact necessary to a recovery against the railroad company is not only strongly supported by the positive testimony, but is irresistibly established by the facts and attending circumstances, leaving the only question about which there could be discussion and doubt, the one we have just been considering.

It may be said generally that it is possible that a case might be presented to this court, in which the injured person voluntarily assumed a position on the pilot of an engine, under such circumstances, that "every being of intelligence would at once recognize that it was a place of great danger," and that it is possible in such a case that this court would say as a matter of law, that the injured person was guilty of contributory negligence, and could not recover; but we are very certain that in this case the evidence does not warrant the court in 2. Questions for jury, for court. making any such declaration. The facts are not undisputed, but on the contrary are sharply controverted, and are of the character that, under our system of jurisprudence, either party can demand that they shall be determined by a jury. That determination has been had and approved by the trial court, and the only question here is, as to whether it has been done in accordance with the well-recognized principles that govern actions of this character. We think they have been substantially observed.

IV. The last contention of counsel that is necessary to notice is, that the court erred in allowing the plaintiff below to amend his petition after judgment so as to make it conform to the facts proven on the trial. The petition alleged that at the time the injury occurred the deceased was standing on the steps of the pilot; but after the trial the plaintiff asked, and the court granted him leave, to amend the petition by alleging —

"That after coupling said engine and box car together, said

Dexter F. McCally remained standing on the steps of the pilot of said engine, the usual place at which brakemen stand when engaged in switching cars on side-tracks in this manner and for such purposes, for a short time, when he ascended to the platform to which the pilot was and is attached upon said engine, and sat down thereon immediately in front of the boiler head and behind the pilot beams — being the large beam to which the pilot is affixed — with his feet drawn up under him."

The power of the court to permit this amendment is not questioned, but it is insisted that the evidence did not authorize it. Counsel forget the rule universally acted upon in this court on disputed questions of fact. It may be that in this particular case, if we were called upon to pass upon this particular question as an original one, that we would agree with counsel that the weight of the evidence as contained in the record was as he contends; but we did not see and hear the witnesses, observe their manner, and notice those many indications and peculiarities that impress the mind of the trial court, and very largely determine the weight and credibility that is to be given to their testimony. The trial court permitted the amendment, and this is equivalent to a finding that the facts are as recited in the amended pleading; and as we can say without hesitation or doubt that there was evidence to sustain the finding, it cannot be disturbed here.

3. Petition— amendment— judgment, not reversed.

Taking into consideration all the material facts and the principles applicable to them, we are satisfied that substantial justice has been done the parties to the action, and that there are no errors prejudicial enough in their character to justify a reversal of the judgment.

It is therefore recommended that the judgment of the district court be affirmed.

By the Court: It is so ordered.

All the Justices concurring.