No. 19,151.

EDWARD G. BAILLOD, *Appellee,* V. THE NELSON GRAIN COMPANY, *Appellant.*

SYLLABUS BY THE COURT.

1. MISSOURI FACTORY ACT—*Personal Injuries—Competent Evidence.* A statute of Missouri provides that: "The belting, shafting, machines, machinery, gearing and drums, in all manufacturing, mechanical and other establishments in this state, when so placed as to be dangerous to persons employed therein or thereabout while engaged in their ordinary duties, shall be safely and securely guarded when possible; if not possible, then notice of its danger shall be conspicuously posted in such establishments." (2 Revised Stat. of Mo. 1909, § 7828.) In an action under this statute testimony of experienced millers was admissible to prove what was the ordinary duty of a miller when a corn mill choked in operation and it became necessary to remove the cause of such choking.

2. SAME—*Defense of Contributory Negligence.* In a brief review of Missouri decisions it appears that while the defense of contributory negligence is available in an action under the statute, it is something different from what was understood by that term before the statute, and is not considered in the same light or upon the same basis. This difference, however, does not appear to have been precisely defined.

3. SAME—*Hand Crushed Between Rollers of Corn Mill—Contributory Negligence for Jury.* A corn mill choked in operation, and to relieve the choking, the miller, after

failing to remove the cause by taking out the product below the rollers, opened a door above them, and proceeded to rake out the corn or product with his hands about ten inches above the grinding rollers. In doing this work his foot slipped and he was thereby thrown off his balance and his hand went down upon and was crushed between the rollers. It is held that the question whether the defendant was guilty of contributory negligence so as to defeat his action, based on the absence of safeguards required by the statute, was one of fact to be determined upon the evidence.

4. SAME—*Safely and Securely Guarding Machinery.* The fact that a corn mill is enclosed in a case covering the machinery does not necessarily prove compliance with the Missouri statute. If the service requires that the covering be opened to machinery dangerous to employees, and safeguards underneath or within are possible and practicable, they must be provided. The question is whether the machinery, so placed as to be dangerous to employees while engaged in their ordinary duties, is in fact safely and securely guarded where it is possible, whether the guard consists of an outer covering or something else.

Appeal from Wyandotte district court, division No. 3; HUGH J. SMITH, judge. Opinion filed January 9, 1915. Affirmed.

*C. Angevine, J. K. Cubbison,* and *William G. Holt,* all of Kansas City, for the appellant; *Pierre R. Porter,* of Kansas City, Mo., of counsel.

*J. O. Emerson,* and *David J. Smith,* both of Kansas City, for the appellee.

The opinion of the court was delivered by

BENSON, J.: This is an appeal from a judgment for damages suffered in operating a corn mill in Kansas City, Mo. The plaintiff alleged that:

"On January 3, 1912, the plaintiff was an employee of the defendant . . . in charge of and attending one of the corn mills of the defendant. This corn mill was being used to grind shelled corn into corn chop. It had two large rollers which were revolving at high speed and were so placed that the corn fed from the

hopper above the rollers was ground and crushed between them. The machine was propelled by a steam engine in a distant part of the plant by means of shafting and belts. Whenever the corn mill became choked up from any cause and such choke up was not relieved, the mill would become so choked as to stop the mill itself and thereby burn and destroy the belts, and it was one of the ordinary duties of the employee in charge in case of a choke up to prevent the destroying and burning of belts. . . . While this plaintiff was in the employ of the defendant in charge of said corn mill and while it was in operation it began to choke up under the rollers and was about to choke so tight as to stop the rollers and burn the belts, and thereupon the plaintiff shut off the flow of corn into the hopper and proceeded to clear the corn from above the rollers as it fell from the hopper and thereby he prevented the belts from burning, but in doing so his left hand was caught and carried between the rollers and his entire left hand and part of his forearm above the wrist were crushed and severed from his body."

The action is based upon the following statute of Missouri:

"The belting, shafting, machines, machinery, gearing and drums, in all manufacturing, mechanical and other establishments in this state, when so placed as to be dangerous to persons employed therein or thereabout while engaged in their ordinary duties, shall be safely and securely guarded when possible; if not possible, then notice of its danger shall be conspicuously posted in such establishments." (2 Revised Stat. of Mo. 1909, § 7828.)

The answer, after a general denial, alleged contributory negligence, and assumption of risk was also pleaded. The following special findings were returned by the jury:

"Q. 1. Was the plaintiff an experienced miller, at and before the time he received the injuries of which he complains? Ans. Yes.

"Q. 2. Was the plaintiff familiar with the construction and operation of the mill by which he was injured? Ans. Yes.

"Q. 3. Were the rollers by which the plaintiff was injured boxed and so enclosed that the plaintiff could

not get his hand between the rollers without first opening the door, and then putting his hand through the opened doorway? Ans. Yes.

"Q. 4. Did the plaintiff voluntarily open the door in front of the roller, and attempt, by the use of his bare hands, to take the shelled corn away from the rollers, while the rollers were revolving rapidly? Ans. Yes.

"Q. 6. Was there a roller, known as the feed roller, above the two rollers between which the plaintiff's hand was caught and injured? Ans. Yes.

"Q. 8. Was it more dangerous to attempt to remove the shelled corn from the rollers, by the use of plaintiff's hands, while the mill was in operation, than it would have been to signal the engineer and thus stop the mill, and then after the mill stopped remove the corn? Ans. Yes."

The findings were made upon the plaintiff's evidence alone, the defendant not having offered any. Error is assigned upon the admission of evidence, upon the order overruling a demurrer to the evidence, upon instructions, and upon the denial of judgment for the defendant on the findings.

The plaintiff alleged that the defendant was negligent in neither safely nor securely guarding the rollers and machinery, and failing to post notice of the danger as the statute required.

The building has three floors, called respectively the ground, first, and upper floors. The engine is on the ground floor. The mill is on the first floor, and the corn to be ground is on the upper floor. The mill is about six feet in height. The corn comes down through a spout into a hopper about fourteen inches wide and three feet long, and through the hopper into feed rollers three inches in diameter and three feet in length. After passing the feed rollers it drops down six or eight inches to the grinding rollers. The mill is a single-stand double-roller Barnard mill, and is operated by cog gears and driven by a belt running from pulleys, one on each side of the mill. A door below the grinding rollers opens into the space underneath. Another door above is hung on hinges at the bottom and fas-

tened by catches at the top.  This door extends the width of the front of the mill and opens into the space above the rollers.  There were two other corn mills in the building.  An elevator was being operated by the same engine as the mill when the injury occurred.

The plaintiff is a miller of fifteen years' experience, familiar with this type of mill.  He had worked two or three months as a hand in the establishment, but had nothing to do with installing this mill.

On the day of the accident the plaintiff started the mill to test its capacity.  He soon noticed that it was choking.  What then occurred is described in his testimony:

"I could tell by the sound the mill was choking, and I opened that door underneath and tried to take the choke out—the door underneath the roll, which is the proper place to take it out if it is possible, but I found the corn chop had stopped in there so tight that it would not feed if I tried to take it out, so I just pushed the thing shut and opened the door on top, and commenced to take the corn out, because I knew it was only a matter of seconds—which I have no power to tell and can not tell as to how soon a mill will choke.  I reached in to pull the corn out.  I used both hands.  I reached in there possibly eight or ten times with both hands.  While I was doing that my foot slipped and kind of throwed me off of my balance and my hand went down that way and cut my hand off.  It fell right in those grinding rolls and cut if off between the elbow and the wrist.  There was no clutch or other apparatus that I could turn that would immediately release the power from the mill.  I could not have thrown the belts from the pulleys; that would be impossible.  I could have signaled the engineer from near that mill by the whistle string—that was about eighteen or twenty feet away, I should judge.  That was just a little cord lying on the floor.  .  .  .  After the mill became in a choking condition I did not go over and pull the cord to signal the engineer to stop because it was not practicable.  By all probabilities by the time I went there and pulled the whistle cord the mill would have been down.  It would have been choked dead.  .  .  .  I would think it would stop in half a minute or more, but I have never

timed it. That is about the length of time after the steam is turned off. There was no other method of disconnecting the power from the mill. There was a clutch downstairs. The way I would have to go that was over 100 feet from the mill. The first thing for a miller to do when he finds the mill is choking is to go to work and relieve the strain on the mill so they won't stop, because whenever the mill stops running, the engine is powerful enough to go ahead and drive the belts around and burn them up.

"Q. Is it one of the duties of a miller to prevent the burning of the belts? A. Yes. . . .

"Q. Now, was there another way to relieve that choke up in time to save the belts, that you know of, than the one you applied? . . . A. No, there was no other way that I know of. . . .

"Q. The reason you did not stop the machinery was because you thought you did n't have time? A. No, sir. I consider I did not have the time to do it."

The questions copied above were answered over the defendant's objections.

Another witness testified:

"Q. If you have a signal within 15 or 20 feet of you by which you can signal to the engineer, the engineer can stop the machinery just like that, can't he (snapping finger)? A. Yes, he can stop.

"Q. Don't you think, Mr. Bowers, you could stop the machinery in that way and thus relieve the choked condition quicker than you could by just dipping your hands in above the grinding rollers? A. No, sir. . . .

"Q. What do you mean by saying an engineer could stop the machinery that quick? A. I mean he could cut off the power that quick, the machinery would n't stop that quick."

The plaintiff testified that there was a clutch downstairs, one hundred feet away, but on being asked if it was in working order, the defendant objected and the objection was sustained.

The plaintiff and other millers of experience who testified that they were familiar with the duties of a miller in the situation of the plaintiff were allowed to testify, over the defendant's objection, that when such

a mill choked it was the duty of the miller to relieve the strain, to shut off the feed, open the door under the rollers and dig out the product if possible, if not, to open the upper door and rake off the stock with the hands while the rollers are still running; that it was the usual and ordinary custom among millers to do this; and that it was not the custom or practice of millers to signal the engineer to stop. A competent witness testified over defendant's objection:

"After a choke-up started, if you tried to relieve that by first shutting down the engine, what is the result? A. Well, the result is, you got to get it out. . . . It saves the belts of course; it only takes a very few revolutions to burn a belt up. If the roll is choked and the engine still running it takes only a very short time, just a few seconds, to ruin that part of the belt that is on your driving pulley."

Evidence was admitted over the defendant's objection that the rollers could be safely and securely guarded to prevent such injuries by placing hopper boards or screens over the grinding rollers on the inside of the machine, leaving a space between them for the corn from the hopper to drop through, so that corn could be scraped out with the hands without danger of injury. There was evidence that other corn mills in the same establishment, one a Lee and Barnard mill, were fitted with such hopper boards, and that it was practicable to put them in this one.

The following special question was presented by the defendant but not allowed:

"Q. 7. Could the plaintiff have stopped the mill, by signaling the engineer, and thus relieved the clogged condition of the mill, if it was clogged, with perfect safety to himself? Ans. Withdrawn by the court."

The principal questions to be decided are: (1) Was testimony tending to prove what the ordinary duties of the miller were, erroneously admitted: (2) Was the defendant entitled to judgment on the demurrer to the evidence or on the findings?

The Missouri statute requires safeguards when the machinery is dangerous to employees while engaged in their ordinary duties. The evidence referred to in the first question suggested was offered to meet this requirement and to show that the plaintiff was in the line of duty when injured. Similar evidence was admitted in the case of an injury to an employee upon a threshing machine (*Mastin v. Levagood*, 47 Kan. 764, 28 Pac. 977), although its competency was not discussed in the opinion. Evidence to prove the duty of a brakeman in keeping trespassers from trains was considered, but its admissibility was not commented on, in *Kemp v. Railway Co.*, 91 Kan. 477, 138 Pac. 621. Similar evidence was discussed in *Mo. Pac. Rly. Co. v. McCally*, 41 Kan. 639, 649, 21 Pac. 574.

It was held in *Mo. Pac. Rly. Co. v. Mackey*, 33 Kan. 298, 6 Pac. 291:

"The inquiry of what are the general duties of a fireman on a switch engine in a certain track yard at a stated time, does not relate to a matter which is the subject of expert testimony, and upon which an opinion may be given, but is a question of fact which may be testified to by any witness having personal knowledge thereof." (Syl. ¶ 2.)

In the opinion it was said:

" 'The duty of a fireman on an engine is to keep the engine hot, to keep steam on, and to assist the engineer in watching for signals.'

"It is claimed by counsel that this testimony was in effect an opinion of the witness that the plaintiff was in the exercise of ordinary care at the time the accident occurred. Not so. There was obviously no purpose to get from the witness his judgment, or an opinion in regard to the manner in which plaintiff had performed this work, or whether he was properly discharging his duty at the time of his injury, nor did the testimony given by him go to that extent. The inquiry went only to the work generally performed by a fireman on an engine in those yards at that time." (p. 304.)

The tendency to liberalize the practice respecting such evidence is luminously stated and advocated in

section 1929 of volume 3 of Wigmore on Evidence. The admissibility of this evidence, however, is not violative of any rule or principle heretofore adopted or followed in this court. In *Railway Co. v. Merrill,* 61 Kan. 671, 60 Pac. 819, testimony of an experienced railroad man regarding the proper position or proper steps for an employee to take in order to pass from a coal car to a box car while in motion was held to be admissible. It was said that the court could not assume that the jury were as competent as the witness to draw a conclusion from the facts, and that such testimony is excluded only when the jury must be considered as equally competent to judge of the situation. *S. K. Rly. Co. v. Robbins,* 43 Kan. 145, 23 Pac. 113, an authority relied upon by the defendant, was examined and distinguished. (See, also, *Duncan v. Railway Co.,* 86 Kan. 112, 115, 119 Pac. 356.)

The principal ground of the objection to the testimony tending to prove the ordinary duty or the customary or usual way of relieving the choked condition is that such evidence can not excuse the plaintiff from doing an act obviously and plainly dangerous and reckless. The determination of this particular objection affects the merits of the case presented in the demurrer to the evidence and motion for judgment now to be considered. Referring again to the Missouri statute, it should be observed that it was competent for the legislature to afford relief even where an employee is guilty of contributory negligence, as our own factory act is held to do. That being so, the question is not altogether whether the employee was negligent within the purview of the law as understood before the statute was enacted, but whether he was performing his ordinary duties within the meaning of that act. This view is supported by decisions of that state, although it is there held in general terms that contributory negligence is still a defense under that statute. Interpreting the statute, Judge Woodson, in *Huss v. Bakery Co.,*

210 Mo. 44, 59, 108 S. W. 63, in a dissenting opinion, after referring to the deplorable loss of life in the great industries of the land, whereby the saying had been given wide publicity in this and foreign countries, that the United States is "a nation of cripples," stated that Missouri was among the first of the states to enact statutes designed to correct such evils, "To stop as near as possible the mighty slaughter." (p. 65.) The opinion is highly instructive throughout, but the following quotation may serve the present purpose:

"The Legislature knew that the human mind and conduct was such that a servant when in the performance of his duties to his master, surrounded by dangerous machinery, in motion, with his mind concentrated upon his work, oblivious to his surroundings, is liable to slip or take a misstep and fall into the revolving machinery, or thoughtlessly thrust his hand or other portion of his body into the gearing or other portion of the machinery; and if not 'safely and securely guarded,' he would in consequence thereof receive injuries of a serious character. It was the intention of the Legislature and the object and the purpose of the statute to put a stop to all such injuries which grow out of such inattention, inadvertence, mishap or accidents, that is, such acts of omission. . . . So, in brief, the rationale of the statute is this: that where it is possible to do so, the master must safely and securely guard the belting, shafting, gearing and drums in his institution; but when this is impossible, then he must give the required notice. This increases the degree of care required of the master regarding those matters from reasonable care to an absolute duty to safely and securely guard such gearing, etc., where it is possible to do so without materially interfering with the working efficiency of the machinery of the institution; but if that is impossible, then he must post the required notice; and if he fails in the performance of those duties, then the burden rests upon him to show that the servant was guilty of such contributory negligence that he would have been injured in consequence thereof, even though the gearing, etc., had been so guarded, or that the notice had been properly posted." (pp. 67, 68.)

The Missouri courts have since approved a part at least of the opinion from which we have quoted. In *Simpson v. Iron Works Co.*, 249 Mo. 376, 155 S. W. 810, the scope of the factory act of Missouri was stated and it was decided that the section (as it then stood) now under consideration did not require the safeguarding of a belt which was not moving but was in a state of inertia, over which the employee had stumbled. In the opinion, however, the court said:

"We think, therefore, that the lawmakers in conditioning the duty to guard upon the phrase above quoted meant thereby that it should attach when the 'belting,' etc., should be so placed in a factory that its normal operation would injure any employee who should approach near enough to be caught by its force or subjected to its activity. Such accidents are likely to happen to employees who are engrossed in work near such machines unless they are protected from the workings of the machinery by safe and secure guards. This thought is expressed with clearness, force and completeness by Woodson, J., in the dissenting opinion of *Huss v. Bakery Co.*, 210 Mo. 67, 68." (p. 389.)

This language was followed by the first part of the quotation which we have copied above.

In *Brashears v. Iron Works Co.*, 171 Mo. App. 507, the dissent in the Huss case is referred to in the following language in the concurring opinion of Judge Sturgis:

"While it is held in *Huss v. Bakery Co.*, 210 Mo. 44, 54, 108 S. W. 63; *Dressie v. Railroad*, 145 Mo. App. 163, 129 S. W. 1012; *Millsap v. Beggs*, 122 Mo. App. 1, 7, 11, 97 S. W. 956, that plaintiff may be guilty of such contributory negligence as bars a recovery even in cases where by statute the machinery should be, but is not guarded, yet I do not understand such cases to hold that plaintiff's conduct as bearing on contributory negligence is to be measured by the same standard of care or, more accurately, that such standard rests on the same basis in cases covered by the statute as it would be if such statute did not exist." (p. 514.)

Further on it was said:

"The purpose and effect of this statute in modifying the rule of contributory negligence in cases covered by it by adding a new element to be considered is pointed out in the able dissenting opinion of Woodson, J., in *Huss v. Bakery Co.*, 210 Mo. 44, 59, 108 S. W. 63, and while his remarks were held not applicable to the particular facts and instruction under discussion in that case, I think the law is there correctly stated. . . . 'Under the common law the defendant was required to furnish plaintiff only a reasonably safe place in which to work and reasonably safe means with which to perform his duties, while the statutes require the defendant to safely and securely guard the gearing when possible; and, if impossible, then to conspicuously post a notice calling attention to the dangers. As a corollary to that *increased* duty of defendant, the care of the plaintiff was correspondingly *decreased* and the jury should have been told so in no uncertain words.'

"This proposition of law also finds recognition in the latest decision of the supreme court. (*Simpson v. Iron Works Co.*, 249 Mo. 376, 155 S. W. 810.)" (p. 516.)

Following this it was said in the Brashears case:

"This case is therefore to be distinguished from the line of cases cited by appellant holding that the servant in somewhat similar circumstances, but where the statute did not apply, was guilty of contributory negligence as a matter of law; and the trial court did right in not directing a verdict for defendant on that ground." (171 Mo. App. 517.)

It seems from this brief review of some of the Missouri decisions that while contributory negligence is still a defense under the statute it is something different from what was understood by that term before the statute. Judge Woodson declared that the contributory negligence must have been such that the injury would have occurred if the gearing, etc., had been guarded, or the notice had been given. If this declaration is not included in the subsequent approval of other parts of the opinion it is still apparent that the employee's negligence, in order to afford a defense, is not considered in the same light, or placed upon the same

basis, as it was before.   As was said in *Millsap v. Beggs,* 122 Mo. App. 1, "The statute must be allowed to count for something." (p. 11.)

The defendant contends that as matter of law the danger of raking out the product with the hands was attended with such obvious and glaring peril that we should hold it to be reckless, and should declare that the evidence offered to prove that this was the ordinary manner of relieving the choked condition was inadmissible.   But it does not follow that a person is reckless because he places his hands near the parts of machinery which if touched will result in grievous hurt. (*Bailey v. Spetter Co.,* 83 Kan. 230, 109 Pac. 791; *Delmore v. Flooring Co.,* 90 Kan. 29, 133 Pac. 151; *Rambo v. Electric Co.,* 90 Kan. 390, 133 Pac. 553; *Bair v. Heibel,* 103 Mo. App. 621.)

The opinion in the Heibel case contains a full discussion of the statute in question, and refers to a distinction between contributory negligence at common law and under the statute.   The employee worked about unguarded cog wheels plainly in view and obviously dangerous, but he lost his balance while pushing a board, lurching against the wheels.   The court said:

"The true question is as to the respondent's contributory negligence; and of that he did not convict himself by simply working around the uncovered cogwheels, unless the danger was so great that a prudent person of his years and capacity would have declined to face it. (*Settle v. Railway,* 127 Mo. 336, 30 S. W. 125; *Pauck v. Provision Co.,* 159 Mo. 467, 61 S. W. 806.)   Assuredly, the court would have acted unjustly had it declared the risk to be that extreme, as a legal deduction." (p. 635.)

There was nothing to injure the plaintiff in his work until he dropped his hand too low, the grinding rollers being ten or twelve inches below the door—and that drop was caused by a slip of his foot.   Doubtless many a man bending over a revolving saw, wheels or other

mechanism in motion, to examine or adjust the parts or otherwise perform his work, has lost life or limb by a fall caused by some untoward slip or mishap which ordinary diligence could not have foreseen. Before the days of safety coupling, brakemen sometimes lost their lives by being crushed under the wheels after a stumble or fall while doing their perilous work. If the plaintiff without slip or other mishap, had thrust his hand upon the roller a different question would have been presented, which can not be decided now. It seems, therefore, that whether the plaintiff was reckless or so negligent in the performance of his work as to afford a defense within the principles already discussed was, in all the circumstances, a question of fact for the jury. In *Lewis v. Barton,* 82 Kan. 163, 107 Pac. 783, it was said:

"The defendant insists that the plaintiff's own testimony shows that he voluntarily undertook to perform the duty imposed upon him in a manner which he knew to be very dangerous, when he also knew that another method was much safer. To a degree the plaintiff's evidence supports this contention. But there was also testimony of the plaintiff and other witnesses that he performed the task in the customary way, and under such evidence it can not be said, as a proposition of law, that the injury was caused by his own want of care, but all these matters are for the consideration of the jury." (p. 165.)

It is contended that the statutory requirements were complied with; that the mill being enclosed afforded the plaintiff immunity from injury and that he himself created the danger by opening the door and thrusting in his hands. It must be presumed, however, that the door was placed there to be opened and that exigencies of the work might require it. The evidence tended to prove that such an exigency arose by the choking condition. The statutory duty is not necessarily discharged by providing a case or covering for machinery. If the service requires that the coverings

Baillod v. Grain Co.

be opened in the progress of the work and safeguards underneath or within are possible and practicable they must be provided. Otherwise such statutes would be vain and ineffectual. The practical question under this statute is whether the machinery so placed as to be dangerous to employees while engaged in their ordinary duties is in fact safely and securely guarded where it is possible, whether the guard consists of an outer covering or something else. Decisions under our statute sufficiently state the principles applicable under the Missouri act. (*Caspar v. Lewin,* 82 Kan. 604, 635, 109 Pac. 657; *Alkire v. Cudahy,* 83 Kan. 373, 111 Pac. 440; *Howell v. Cement Co.,* 86 Kan. 283, 120 Pac. 350.)

The question whether it was possible or practicable to guard the rollers was one of fact, upon which the evidence offered was admissible. (*Warfield v. Morgan,* 86 Kan. 524, 121 Pac. 489.)

The defendant requested an instruction to the effect that it was the duty of the plaintiff to stop the mill before proceeding to remove the obstruction. This presents the question already considered, which is held to be a question of fact. In *Wells v. Swift & Co.,* 90 Kan. 168, 133 Pac. 732, it appeared that an employee had been injured by the unexpected starting of a rotary motor driven by compressed air. It was held that:

"The fact that a screw valve was provided at another point by which the plaintiff could have cut off the compressed air is not fatal to his recovery, since to have used that valve would have cut the air off from another machine as well as from that which he was using." (Syl. ¶ 2.)

It was held in *Rambo v. Electric Co.,* 90 Kan. 390, 133 Pac. 553, that an employee of a telephone company could not be charged with contributory negligence as a matter of law merely because he failed to ask that the current be turned off, but incurred the danger of contact with high-tension wires without doing so, although the current would have been turned off had he so requested.

These cases sufficiently state the principle to be applied in the situation in which the plaintiff was placed.

The instructions given were as favorable to the defendant as could well be given in any recognized application of the doctrine of contributory negligence. Instructions asked by the defendant were drawn upon the assumption that the plaintiff should be held guilty of contributory negligence as a matter of law upon the evidence, or certain phases of the evidence, and the findings. The substance of the requests, so far as they embraced correct propositions, was given. No error is found in the instructions of which the defendant can justly complain.

There was no error in refusing to submit question No. 7. That the mill could have been stopped is beyond dispute, but whether it was the duty of the plaintiff to signal for the stop was a question of fact. The question whether he should have used the clutch was of the same nature, and besides he offered to show that it was not in a condition to use. The fact was material and the evidence was admissible.

Some other incidental matters are discussed in the briefs, but are sufficiently met by what has been said upon the principal propositions.

The judgment is affirmed.